# IN RE COY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF INDIANA.

No. 1395.   Argued April 16, 17, 1888. — Decided May 14, 1888.

The acts of Congress and the statutes of Indiana make it a criminal offence for an inspector of elections, or other election officer, at which an election for a member of Congress is held, to whom is committed the safe keeping and delivery to the board of canvassers of the poll books, the tally sheets, and the certificates of the votes, to fail or omit to perform this duty of safe-keeping and delivery.

In an indictment in a court of the United States for a conspiracy to induce these officers to omit such duty, in order that the documents mentioned might come to the hands of improper persons who tampered with and falsified the returns, it is not necessary to allege or prove that it was the intention of these conspirators to affect the election of the member of Congress who was voted for at that place, the returns of which were in the same poll books, tally sheets, and certificates with those for state officers.

The authority of Congress to protect the poll books which contain the vote for a member of Congress, from the danger which might arise from the exposure of these papers to the chance of falsification or other tampering, is beyond question, and this danger is not removed because the purpose of the conspirators was to falsify the returns as to state officers found in the same poll books and certificates, and not those of the member of Congress.

The writ of *habeas corpus*, in case of a person held a prisoner by sentence of court, can only release the prisoner when it is shown that the court had no jurisdiction to try and punish him for the offence. The inquiry in such case is not whether there is in the indictment such specific allegation of the details of the charge as would make it good on demurrer, but whether the indictment describes a class of offences of which the court has jurisdiction, and alleges the defendant to be guilty. If the record of the case in which judgment of imprisonment is pronounced contains no charge of such offence, he should be discharged.

The prisoners in the present case are specifically charged with an offence against the election laws of Indiana and of the United States, by a conspiracy to violate those laws; and this court holds that the District Court of the United States for Indiana had jurisdiction to try and punish them for that offence, and the judgment of the Circuit Court refusing the writ of *habeas corpus* is accordingly affirmed.

THIS was a petition for a writ of *habeas corpus*. The District Attorney of the United States for the District of Indiana

demurred to the petition, and the demurrer was sustained and the writ refused. The petitioners appealed. The case is stated in the opinion.

*Mr. Cyrus F. McNutt* and *Mr. D. W. Voorhees* for appellants. *Mr. John G. McNutt* and *Mr. Finley A. McNutt* were on the appellants' brief.

*Mr. E. B. Sellers* and *Mr. Attorney General* for appellee.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the District of Indiana.

The case in that court arose upon an application for a writ of *habeas corpus* made on behalf of Simeon Coy and William F. A. Bernhamer, whose petition alleged that they were restrained of their liberty and detained in the custody of Edward Hawkins, the marshal of the United States for the District of Indiana, and Isaac King, sheriff of Marion County in that State, who claimed to hold the prisoners under the authority of a judgment of the United States District Court. The petition sets forth the nature of the proceedings by which they were indicted and tried in that court, wherein they were found guilty of the charges specified in the indictment. The sentence of the court was " that the said William F. A. Bernhamer make his fine to the United States in the sum of one thousand dollars, and that he be imprisoned in the State Prison North (of said State) for the period of one year; and that the said Simeon Coy make his fine to the United States in the sum of one hundred dollars, and that he be imprisoned in the said State prison for the period of eighteen months." The prisoners were thereupon committed to the charge of the marshal, in whose custody they were at the time when this petition was filed.

The petitioners also presented a copy of the indictment, attached to their petition, which they say charges no offence against the United States, and that the federal district court and the grand jury thereof had no jurisdiction in the premises.

They allege that the action of said grand jury in returning the indictment, and of the court and the marshal thereof in taking them into custody and restraining them of their liberty under and by virtue of the judgment, order and commitment of said court, are wholly void, and the imprisonment of the petitioners unlawful.

To this petition, praying for a writ of *habeas corpus*, a demurrer was filed by the attorney of the United States for said district on behalf of the marshal and the sheriff. Upon the hearing of that demurrer it was sustained by the Circuit Court,[1]

---

[1] By request of Mr. Justice Miller the following opinion of Mr. Justice Harlan, *In re Coy*, 31 Fed. Rep. 794, taken from the Government's brief, is repeated here. It relates to a different indictment for the same offence, and bears directly upon the questions discussed by the court.

HARLAN, J. The petitioner, Coy, is in custody under process based upon two indictments in the District Court of the United States for the District of Indiana.

He claims that that with which he is charged, if crimes at all, are crimes against the State, and not against the United States; consequently, that the District Court is without jurisdiction to proceed against him. If this contention be sound, the prisoner is entitled to be discharged. *Ex parte Lange*, 18 Wall. 163; *Ex parte Rowland*, 104 U. S. 604; *Ex parte Fisk*, 113 U. S. 718, 724. Otherwise he must be remanded to the custody of the proper officer to be tried for the offences charged.

One of the indictments is under § 5440 Rev. Stat., which provides that "if two or more persons conspire either to commit any offence against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment, in the discretion of the court." § 5446 Rev. Stat., as amended by the act of May 17, 1879, c. 8, 21 Stat. 4. The first count of that indictment charges that Samuel E. Perkins, Simeon Coy, Henry Spaan, John H. Councilman, Charles N. Metcalf, John E. Sullivan, Albert T. Beck, George W. Budd, Stephen Mattler, William F. A. Bernhamer, and John L. Reardon did " conspire, confederate, and agree together, between and among themselves, to commit an offence against the United States, and did then and there, unlawfully, knowingly, and feloniously, then and there conspire, combine, confederate, and agree together, between and among themselves, to induce, aid, counsel, procure, and advise one Allen Hisey to unlawfully neglect and omit to perform a duty required and imposed by the laws of the State of Indiana relating to and affecting a certain election had and held at and in the county of Marion, in the State

which refused to issue the writ as prayed in the petition. From
this judgment the prisoners took an appeal to the Supreme

and District of Indiana, and at the second precinct of the thirteenth ward
of the city of Indianapolis, in the county of Marion aforesaid, on the 2d
day of November, A.D. 1886, pursuant to law, at which election a Represen-
tative in Congress for the Seventh Congressional District of Indiana was
voted for, to wit: To unlawfully neglect and omit to safely keep in his
possession and custody the tally papers, poll lists, and certificates of said
election at said precinct; he, the said Allen Hisey, being then and there an
officer of said election, to wit, an inspector of said election at the second
precinct of the thirteenth ward of the city of Indianapolis aforesaid, having
been thereto duly appointed, and having duly qualified under the laws of
the State of Indiana, and acting as such inspector; and that, to effect the
object of said conspiracy, the said Samuel E. Perkins then and there, after
one of the tally papers and one of the poll lists of said election at said pre-
cinct, and the certificate of the number of votes each person had received
at said election at said precinct, designating the office, signed by the board
of judges of said election at said precinct, had been deposited with him,
the said Allen Hisey, as inspector as aforesaid, and that after he, the said
Allen Hisey, had received the said tally paper, poll list, and certificate afore-
said, for the purpose of returning the same to the board of canvassers of
said election for the county of Marion aforesaid, he, the said Samuel E.
Perkins, did then and there, by unlawfully and feloniously counselling and
advising him, the said Allen Hisey, so to do, and by other unlawful means,
to the grand jurors aforesaid unknown, unlawfully used to effect the same
unlawful purpose, unlawfully induced and procured him, the said Allen
Hisey, to unlawfully omit and neglect to safely keep said tally paper, poll
list, and certificate in the possession and custody of him, the said Allen
Hisey, as inspector as aforesaid, and by said unlawful means induced and
procured said Allen Hisey, as inspector as aforesaid, to surrender and de-
liver to and into the possession of the said Samuel E. Perkins, and permit
him, the said Samuel E. Perkins, to take and have the possession and cus-
tody of said tally paper, poll list, and certificate, and the said tally paper to
then and there unlawfully mutilate, alter, forge, and change, before the
said tally paper, poll list, and certificate had been returned to and canvassed
and estimated by the board of canvassers of the said election of the county
of Marion aforesaid, he, the said Samuel E. Perkins, not being then and
there an officer of said election, and not then and there being a person
authorized by the laws of the State of Indiana to have possession and cus-
tody of said tally paper, poll list, and certificate aforesaid, contrary to the
form of the statute of the United States, and against the peace and dignity
of the United States of America." The second count charges the defend-
ants with having committed a like offence in respect to the same election in
the second precinct of the twenty-third ward of Indianapolis; and the third
count charges them with having committed a like offence in respect to the
election in the second precinct of the tenth ward.

Court, which was allowed, and the same has been very fully argued in this court, both on their behalf and on the part of the government.

---

The other indictment is against Coy alone. It charges him with having unlawfully and feloniously advised, induced, and procured the inspector at said election in the third precinct of the thirteenth ward — with whom was deposited the poll list, tally paper, and certificate of the election — to neglect and omit the performance of the duty, imposed by law, of safely keeping said documents in his possession until delivered to the board of canvassers, and to surrender them to Perkins, by whom they were altered and mutilated.

Under what circumstances is the failure, neglect, or refusal of an officer of an election, at which a Representative in Congress is voted for, to perform a duty imposed upon him, as such officer, by the law of the State, an offence against the United States?

By § 5511 Rev. Stat., it is provided that "if, at any election for Representative or Delegate in Congress, any person . . . interferes in any manner with any officer of such election in the discharge of his duties; or by any such means, or other unlawful means, induces any officer of an election, or officer whose duty it is to ascertain, announce, or declare the result of any such election, or give or make any certificate, document, or evidence in relation thereto, to violate or refuse to comply with his duty or any law regulating the same; . . . or aids, counsels, procures, or advises any such . . . officer to do any act hereby made a crime, or omit to do any duty the omission of which is hereby made a crime, or attempt to do so, he shall be punished," etc.

That the persons mentioned in the various counts of the indictment for conspiracy as inspectors of election were lawfully in the discharge of the functions appertaining to that position is conceded in argument, and is aptly alleged in the indictment. It is also conceded, and, if it were not, it is clear, from the statutes of the State, to be hereafter examined, that they were under a duty to give or make a certificate, document, or evidence in relation to the election in their respective precincts. Each inspector, at such election, who violated or refused to comply with his duty, or any law regulating the same, as well as every one who aided, counselled, procured, or advised him to violate, refuse, or omit to perform his duty, were, according to the express words of this section, guilty of a crime. It is equally clear, in the other case, that the petitioner, Coy, committed a crime if he aided, counselled, procured, or advised an inspector at such election to violate or to refuse or omit to comply with his duty or any law regulating the same.

By § 5515 it is provided: "Every officer of an election at which any Representative or Delegate in Congress is voted for, whether such officer of election be appointed or created by or under any law or authority of the United States, or by or under any state, territorial, district, or munici-

The record presented to us is very simple, there being no
other statement of the proceedings had upon the indictment

pal law or authority, who neglects or refuses to perform any duty in regard
to such election required of him by any law of the United States, or of any
State or Territory thereof; or who violates any duty, so imposed; or who
knowingly does any acts thereby unauthorized, with intent to affect any such
election or the result thereof; . . . shall be punished as prescribed in sec-
tion fifty-five hundred and eleven."

Observe, "intent" is not made an element in determining the existence
of the offences specified in that section, except in those cases where the
offender knowingly does an act "unauthorized" by the law of the United
States, or by the law of the State or Territory under whose sanction he ex-
ercises the functions of an officer of election. His neglect or refusal to
perform a *duty* required by law in regard to an election, *at which a Represen-
tative of Congress is voted for*, is made by this section an offence against the
United States, although such non-performance of duty is without an evil
intent; while the doing of an act simply "unauthorized" by law is not
punishable unless done with an intent to affect the election or the result
thereof. Whether that distinction is justified by sound public policy was
for the law-making department of the government to determine. It was
well said by the court, commenting on § 5515, in *United States* v. *Jackson*,
25 Fed. Rep. 548, 549, 550:

"Congress seeks by this statute to guard the election of members of
Congress against any possible unfairness, by compelling, under its pains
and penalties, every one concerned in holding the election to a strict and
scrupulous observance of every duty devolved upon him while so engaged.
. . . The evil intent consists in disobedience to the law. The legisla-
ture has the power to adjudge, and does adjudge, that the doing of the
thing is not for the public good; and whether its judgment be wise or un-
wise, it is always binding on the citizen, and the doing of it is a crime.
This is particularly so with reference to that class of statutes imposing
duties on public officials in the exercise of their public functions. The
command of the legislative will must be obeyed, and disobedience is a
crime, and may be punished as such."

I proceed to inquire whether the alleged surrender of the certificate,
tally paper, and poll list was a violation of any *duty* imposed upon the in-
spector as an officer of the election at which a Representative in Congress
was voted for. If it was, it follows, in view of the plain words of the
statute, that he committed an offence against the United States; conse-
quently, those who conspired to induce or procure, and any one who ad-
vised, counselled, induced, or procured him to neglect or violate his duty by
surrendering the election papers to Perkins also committed an offence
against the United States.

The duties imposed by the laws of the State upon inspectors at an elec-
tion at which a Representative in Congress is voted for are set forth in
c. 56 of the Revised Statutes of the State of 1881.

Opinion of the Court.

than is contained in that instrument itself, and the judgment of the court upon the trial. As the Circuit Court refused to

---

Township trustees, by virtue of their office, are inspectors of election in the precincts in which they reside. Prior to the opening of the polls they appoint two judges of different political parties, who, with the inspector, constitute a board of election. Rev. Stat. Indiana, § 4688. The judges and the inspector, before the election is opened, are required to take an oath to support the Constitution of the United States and of the State, and to faithfully and impartially discharge the duties assigned by law. Id. § 4692. The inspector is the chairman of the board of election. Id. § 4695. When the polls are closed it is made the duty of himself and the election judges to open the ballot-box and count the votes, the ballots to be taken out one by one by the inspector, "who shall open them as he takes them out, and read aloud the name of each person printed or written thereon, and the office for which every such person is voted. He shall then hand the ballot to one of the judges, who shall examine the same and hand it to the other judge, who shall string it on a thread of twine." Id. § 4710. No person can be admitted to the room where the counting is done, except the members of the board of election, the sworn clerks, and two voters from each political party having candidates to be voted for. Id. § 4711.

Other sections of the statutes of Indiana are as follows:

" SEC. 4712. When the votes shall be counted the board of judges shall make out a certificate under their hands, stating the number of votes each person has received, and designating the office, which number shall be written in words; and such certificate, together with one of the lists of voters and one of the tally papers, shall be deposited with the inspector, or with one of the judges selected by the board of judges.

" SEC. 4713. As soon as the votes are counted, and before e certificate of the judges as prescribed in the foregoing section is made out, the ballots, with one of the lists of voters and one of the tally papers, shall, in the presence of the judges and clerks, be carefully and securely placed by the inspector, in the presence of the judges, in a strong and stout paper envelope or bag, which shall then be tightly closed and well sealed with wax by the inspector, and shall be delivered by such inspector to the county clerk at the very earliest possible period before or on the Thursday next succeeding said election; and the inspector shall securely keep said envelope containing the ballots and papers therein, and permit no one to open said envelope, or touch or tamper with said ballots or papers therein. And upon the delivery of such envelope to the clerk, said inspector shall take and subscribe an oath before said clerk, that he has securely kept said envelope, and the ballots and papers therein, and that, after said envelope had been closed and sealed by him in the presence of the judges and clerks, he had not suffered or permitted any person to break the seal or open said envelope, or touch or tamper with said ballot or papers, and that no person has broken such seal or opened said envelope to his knowledge; which oath shall be filed in said clerk's office with the other election papers.

VOL. CXXVII—47

grant the writ of *habeas corpus* there is no return by the mar-
shal and the sheriff, so that we have none of the facts or evi-

---

" SEC. 4714. The clerk shall securely keep said envelope so sealed, with
the ballots and papers therein, in the same condition as it was received by
him from the inspector in his office (unless opened by said inspector, in the
presence of the board of canvassers, as herein provided), for the period of
six months. But, when such election is contested he shall preserve them
so long as such contest is undetermined, subject to the order of the court
trying such contest. . . .

" SEC. 4715. The inspectors of each township or precinct, or the judges
of election to whom the certificates, poll-books, and tally papers shall have
been delivered as provided for in this act, shall constitute a board of can-
vassers, who shall canvass and estimate the certificates, poll lists, and tally
papers returned by each member of said board : for which purpose they
shall assemble at the court-house, on the Thursday next succeeding such
election, between the hours of ten A.M. and six o'clock P.M.

" SEC. 4716. The members of such board who shall assemble at such
time and place shall select one of their number as chairman, and the clerk
of the Circuit Court shall act as their clerk.

" SEC. 4717. Such board, when .organized, shall carefully compare and
examine the papers intrusted to it, and aggregate and tabulate from them
the vote of the county; a statement of which shall be drawn up by the
clerk, and shall contain the names of the persons voted for, the office, the
number of votes given in each township and precinct to each person, the
number of votes given to each in the county, and also the aggregate num-
ber of votes given; which statement shall be signed by each member of
said board; which canvass sheet, together with such certificates, poll-books,
and tally papers, shall be delivered to the clerk, and by him filed in his
office. The same shall be preserved by him, open to the inspection of any
legal voter of the county or district or State."

These statutes have been referred to at large in order to show the great
care taken by the State to guard the ballot against fraud, to secure a cor-
rect canvass of the votes cast and an honest declaration of the result. It
appears that the laws of Indiana contain special provisions for the custody
of two sets of papers relating to general elections : (1) The ballots, one of
the lists of voters, and one of the tally papers, sealed up in a paper envelope
or bag, must be delivered by the inspector into the custody of the county
clerk. (2) The certificate prepared by the board of judges, showing the
number of votes each candidate received, and designating the office, to-
gether with one of the lists of voters and one of the tally papers, must be
" deposited with the inspector," and be returned by him to the board of
canvassers, who meet on the Thursday succeeding the election for the pur-
pose of canvassing and estimating " the certificates, poll lists, and tally
papers." To the latter papers the present indictments refer. They are the
papers which, it is charged, were " deposited " with the inspector by the

dence in the case except as they are detailed in the indictment.
The only question raised by the petitioners, supported by sev-

board of election, and, after being surrendered to Perkins, were forged,
altered, and mutilated.

It will be observed that the local statute does not, in express terms,
require the inspector to keep those papers in his actual manual custody,
during the whole period intervening after they are "deposited" with him,
and before he returns them to the board of canvassers. It is therefore con-
tended that the surrender of them to Perkins was not a violation of any
*duty* imposed upon the inspector, and could not be deemed a crime unless
done with the intent to affect in some way the result of the election for
Representative in Congress; and that, as it is not charged in the indict-
ment that the alleged surrender of the election papers was with such intent,
or that the alleged forgeries and alterations in fact affected the result of
the election for Representative in Congress, it does not appear that any
offence against the United States was committed.

In support of these positions, counsel for the prisoner invoke the famil-
iar rule that penal statutes are to be construed strictly; that is, for the
benefit of him against whom the penalty is inflicted. Dwar. St. 634. It is
doubtful whether that rule has any application in the present case; for the
statutes of Indiana, to which we have referred, merely regulate the conduct
of general elections in that State, and define the duties of the officers of
such elections. Let it, however, be conceded, for the purposes of this case,
that, in determining whether the prisoner has committed a crime, the
statutes of Indiana and the statutes of the United States relating to the
election of Representatives in Congress, taken as a whole, should be inter-
preted as penal statutes strictly, and not as remedial enactments to be lib-
erally construed in order to suppress the frauds and public wrongs against
which they are directed. *Taylor* v. *United States*, 3 How. 197, 210; *United
States* v. *Hartwell*, 6 Wall. 385. Still the inquiry remains as to the intent
with which the legislative department enacted these laws. In giving effect
to the rule that penal statutes must be strictly construed, the court must not
disregard the kindred rule, that the intention of the law-maker, to be gath-
ered from the words employed, governs in the construction of all statutes.
It was said by'the Supreme Court of the United States, speaking by Chief
Justice Marshall in *United States* v. *Wiltberger*, 5 Wheat. 76, 95, that "though
penal laws are to be construed strictly, they are not to be construed so
strictly as to defeat the obvious intention of the legislature. The maxim is
not to be so applied as to narrow the words of the statute to the exclusion
of cases which those words, in their ordinary acceptation or in that sense
in which the legislature had obviously used them, would comprehend." So,
in *United States* v. *Morris*, 14 Pet. 464, 475, Chief Justice Taney, speaking
for the court, said: "In expounding a penal statute the court certainly will
not extend it beyond the plain meaning of its words; for it has been long
and well settled that such statutes must be construed strictly. Yet the

eral points in regard to the statutes applicable thereto, is that the District Court which tried the indictment had no jurisdic-

---

evident intention of the legislature ought not to be defeated by a forced and overstrict construction." See also *American Fur Company* v. *United States*, 2 Pet. 358, 367.

Giving to the prisoner the full benefit of the rule of interpretation invoked in his behalf, — leaning to the side of mercy where the liberty of the citizen is involved, — I entertain no doubt that the statutes of Indiana, fairly construed, impose upon an inspector who receives the certificate, tally sheet, and poll list of a general election the duty of safely keeping them in his own custody until they are delivered or returned to the board of canvassers. The requirement that they shall be " deposited " with him, and that the board of canvassers, of which he is *ex officio* a member, shall " canvass and estimate the certificates, poll lists, and tally papers *returned by each member of said board*," is inconsistent with the idea that he may, prior to the assembling of the board of canvassers, voluntarily surrender these important papers into the hands of others. I say important papers, because, upon examining the statutes and the decisions of the supreme court of Indiana, it will be found that, although in contested election-cases the ballots, lists of voters, and tally papers, sealed up and delivered to the county clerk, are primary and conclusive evidence of the result of the election, *Reynolds* v. *State*, 61 Ind. 392, 422 *et seq.*, the papers " deposited " with the inspector constitute the basis upon which rests the official declaration in the first instance of the result of all elections in the State. *Moore* v. *Kessler*, 59 Ind. 152. The election of members of the state legislature, Governor, Representatives in Congress, and electors for President and Vice-President all rest upon the papers so deposited with inspectors. Rev. Stat. Ind., §§ 4717, 4718, 4721, 4723, 4724, 4726–4729. It is inconceivable that any inspector could suppose it to be consistent with his duty to part with these papers in advance of his meeting his colleagues of the board of canvassers. They are deposited with him as an officer of the law, acting under the sanction of an oath. The word " deposited " implies that the depositary must safely keep these papers in his own custody until he surrenders them to the board whose duty it is to canvass the returns and certify the result of the election. While he may not be responsible for their absolute safety in every case, he is under a solemn duty to guard them with diligence, proportioned to their value, and to the danger that might come to the public from their loss or mutilation. He holds them in trust for the public, and his duty to retain them in his own exclusive custody is quite as clearly defined as if the statute had so declared in express words. If he voluntarily parts with them before they are returned to the board of canvassers they are no longer " deposited " with him. Any other construction would defeat the obvious intention of the legislature and shock the common sense of every one interpreting these statutory provisions in the light of the ordinary meaning of the words used.

tion. This proposition is founded, not upon any want of jurisdiction of the person, but upon the broad statement that the

---

It is said that the inspector would not violate his duty by depositing these papers after they were received by him in some bank for safe-keeping; consequently it is contended he need not always have them in his actual manual custody. This might depend upon the mode of the deposit. If they were placed in a box in the bank vault, and he alone had access to that box, they might in such a case be regarded as in his actual custody. Other cases might be supposed in which his duty to hold the papers might not be violated by the particular mode adopted for their preservation. But no case of doubtful character is now before us. The specific charge in the indictment is that the inspector unlawfully surrendered the papers to Perkins, who had no right under the law to their custody, and that he was induced to do so by Coy in one case, and in the other case by Coy and his confederates.

It was also said in argument that the indictments do not state that the crimes charged were committed in relation to or at an election for Representative in Congress. Counsel overlook the fact that in one case the accused are charged with a conspiracy to procure and induce, and in the other case that Coy procured and induced, the inspector to unlawfully neglect and omit to perform a duty required by the laws of the State " relating to and affecting a certain election *had and held* . . . on the 2d day of November, 1886, *pursuant to law, at which election* a Representative in Congress for the Seventh Congressional district of Indiana was voted for," etc. I know judicially that such an election was authorized by law to be held, and I must take judicial knowledge of what every one knows, that such an election was in fact held at the time and place specified in the indictment. The general averment that the election was held on the day fixed by statute and " pursuant to law " is sufficient to show that it was one at which a Representative in Congress could be legally voted for.

But it is earnestly insisted that the certificate made by the board of election showing the number of votes received by each person and " designating the office " is to be deemed a separate document in respect to each candidate voted for, or at least that it was one document so far as it related to candidates for state offices and a different document or paper so far as it related to the election held for Representative in Congress; and that, in the absence of a specific averment in the indictment showing the surrender of the documents in question to Perkins to have been procured in one case by the prisoner and in the other case by him and his co-defendants, with direct reference to the vote for Representative in Congress, the district court must be held to be without jurisdiction to proceed; in other words, that the mere surrender by the inspector to Perkins of the certificate and other documents deposited with him, nothing else appearing, is not, and could not legally be made, an offence against the United States.

In these views I do not concur. It was conceded in argument, and it

indictment presents no crime or offence under the laws of the
United States.

---

may be inferred from the statutes, that the certificate in question was in
fact one paper, in that it stated the result of the election as to each candi-
date.  So, also, as to the copy of the tally paper and poll list placed in the
hands of the inspector.  They were none the less documents in regard to
an election for Representative in Congress, because they also showed the
number of votes cast at the same polls for state officers.  And we have
seen that the inspector was under a duty imposed by law to keep them in
his custody until returned to the board of canvassers, and that, by Revised
Statutes of the United States, the inspector at an election at which a Repre-
sentative in Congress is voted for is guilty of a crime against the United
States if he neglects or refuses to perform, or violates *any duty* imposed
upon or required of him " in regard to such election " by any law of the
United States or of the State in which such election is held.  It is not diffi-
cult to understand the reasons which induced the State to require the certifi-
cate and one copy each of the poll list and tally paper to be deposited with
and safely kept by the inspector until returned by him to the board of can-
vassers.  If mutilated or changed before they reach that board, their value
as legal evidence in regard to the election both for state and national offi-
cers, might be impaired or destroyed.  If skilfully altered by bad men, the
will of the people as expressed at the polls might be defeated.  Common
prudence, therefore, suggested the necessity of guarding against every
possibility of such mutilation or alteration.  To that end these papers were
required to be " deposited " with the inspector as soon as the vote was
counted by the judges of the election.  In holding them prior to their being
returned to the board of canvassers, that officer represented both the State
and the United States.  The national and state governments were alike
interested in the faithful discharge of his duty as a public depositary.  The
documents intrusted to him in that capacity, may be said to have been the
joint property of the two governments.  To part with them was a violation
of his duty to the State, and therefore a crime against the United States,
because they related to an election for Representative in Congress, and
because his neglect or refusal to perform, or his violation of, a duty im-
posed upon him by law " in regard to such election " is made by the express
words of the act of Congress an offence against the United States, punisha-
ble by fine or imprisonment, or both.  In order to obtain an honest canvass
of the votes cast at an election for Representative in Congress, that which
the State makes the inspector's duty to her, in respect to documents relat-
ing to the election, is made by the act of Congress a duty to the United
States.  It is consequently not necessary to set out in the indictment the
precise nature of the alternations made by Perkins, nor aver that they were
designed to affect, or in fact affected, the result of the election for Repre-
sentatve in Congress.  As the papers in question related to the election for
Representative in Congress — although containing evidence as to the election

The indictment itself is of considerable length, although consisting of but one count. It reads as follows:

"The grand jurors of the United States, within and for the District of Indiana, impanelled, sworn, and charged in said court, at the term aforesaid, to inquire for the United States within and for the District of Indiana aforesaid, upon their oath present that Simeon Coy, Henry Spaan, John H. Councilman, Charles N. Metcalf, John E. Sullivan, Albert T. Beck, George W. Budd, Stephen Mattler, William F. A. Bernhamer,

---

for state officers — the mere surrender of them to Perkins by the inspector, in violation of the duty imposed upon him by law, constituted an offence against the United States, without reference to the nature of the alleged alterations or forgeries. The offence of the inspector was complete the moment he surrendered the papers to Perkins; and when the latter received them, the offence of the prisoner in the one case, and the offence of the prisoner and his co-conspirators in the other case, were also complete.

The authority of Congress to enact the statutes to which reference has been made is no longer an open question in the courts of the Union. Such legislation is authorized by that provision of the Constitution which invests Congress with power to make regulations as to the time and manner of holding elections for Representatives in Congress, or to alter such regulations as the State prescribes. Article 1, Section 4. The requirement that officers of elections at which such Representatives are voted for shall perform the duties imposed by the State in regard to such elections is the same, in legal effect, as if Congress had in the first instance and by direct legislation imposed those duties upon those officers. It would be extraordinary indeed if the nation could not prescribe penalties for the nonperformance of duties in regard to elections for Representatives in Congress by those exercising the functions of officers at such elections. It is immaterial that such officers were appointed by the State. When supervising elections for Representatives in Congress, they can be reached by the power of the United States, and punished for neglect of the duties they assume to discharge. These views are sustained by the elaborate judgments of the Supreme Court of the United States in *Ex parte Siebold*, 100 U. S. 371; *Ex parte Clarke*, 100 U. S. 399; and *Ex parte Yarbrough*, 110 U. S. 651; in which the power of Congress, either by direct legislation or by adopting the regulations established by the State to secure the integrity and freedom of elections at which Representatives in Congress are chosen, is placed upon grounds that cannot be shaken. Those cases cover the whole field of argument.

I am of opinion that the District Court of the United States has jurisdiction to proceed under these indictments.

*The application for the discharge of the prisoner must therefore be denied. It is so ordered.*

and John L. Reardon, late of said district, at the district afore-
said, on the third of November, in the year of our Lord one
thousand eight hundred and eighty-six, unlawfully, knowingly
and feloniously did then and there conspire, confederate, and
combine and agree together, and with one Samuel E. Perkins,
to commit an offence against the United States in this, to wit:
The grand jurors aforesaid, impanelled and sworn as aforesaid,
do charge and present that on the 2d day of November, in
the year of our Lord one thousand eight hundred and eighty-
six, an election for a Representative in the Congress of the
United States from the Seventh Congressional District of the
State of Indiana, was lawfully had and held in and for said
Seventh Congressional District of Indiana; that the county of
Marion in said State, and the city of Indianapolis, situated in
said county, are, and on said 2d day of November, in the year
of our Lord one thousand eight hundred and eighty-six, were
in and constituted parts of said congressional district, and that
at said election for Representative in Congress, so held in said
district and in said county and city, a Representative in Con-
gress was lawfully voted for at each and every voting precinct
of said district and of said county and city, including the pre-
cincts hereafter particularly named; that at said election one
Allen Hisey served [as] and was the lawful inspector of the
election at and for the second precinct of the thirteenth ward
of said city of Indianapolis, and at said election said John H.
Councilman served [as] and was the lawful inspector of elec-
tion at and for the second precinct of the fourth ward of said
city of Indianapolis, and that at said election said Stephen
Mattler served as and was the lawful inspector of election at
and for the third precinct of the thirteenth ward of said city
of Indianapolis, and that at said election one Lorenz Schmidt
served as and was the lawful inspector of election at and for
the first precinct of the twenty-third ward of said city of In-
dianapolis, and one Joel H. Baker served as and was the law-
ful inspector of election at and for the sixth precinct of Center
township in said county of Marion, and one Joseph Becker
served as and was the lawful inspector of election at and for
the second precinct of the eleventh ward of the city of In-

dianapolis aforesaid, and one Andrew Oehler served as and was the lawful inspector of election at and for the first precinct of the seventeenth ward of said city of Indianapolis, and one John Edwards served as and was the lawful inspector of election at and for the second precinct of the eighteenth ward of said city of Indianapolis.

"That at and after the close of the election aforesaid, and until delivery was made to the clerk of said county and to the board of canvassers of said county, each of said inspectors had in his lawful possession the ballots, tally papers, poll lists, and certificates of the board of judges of election of and for the precinct of which he was and had been inspector as aforesaid; said ballots, poll lists, tally papers, and certificates each contained evidence in respect to said election of Representative in Congress, and said grand jurors aforesaid do charge and present that at said district, on said third day of November, in the year of our Lord one thousand eight hundred and eighty-six, said defendants Simeon Coy, Henry Spaan, John H. Councilman, Charles N. Metcalf, John E. Sullivan, Albert T. Beck, George W. Budd, Stephen Mattler, William F. A. Bernhamer, and John L. Reardon, intending to obtain unlawful possession of said papers and election returns so in the custody of said inspectors, and feloniously to mutilate, alter, forge, and change the said poll lists, tally papers, and certificates of the judges of election, did unlawfully and feloniously conspire, confederate, combine, and agree together, and with said Samuel E. Perkins, unlawfully and by false and deceitful speeches, statements, assertions, and promises, and by other unlawful means to the grand jurors unknown, to counsel, assist, aid, procure, and induce said Allen Hisey, Lorenz Schmidt, John H. Councilman, Stephen Mattler, Joel H. Baker, Joseph Becker, Andrew Oehler, and John Edwards, inspectors as aforesaid, and each of them, unlawfully to omit, neglect, fail, and refuse to perform the duties imposed by the laws of the State of Indiana upon them and each of them safely to guard, keep, and preserve from harm and danger the papers, poll lists, tally papers, and certificates of the judges of election so deposited with them, the said inspectors, and each

of them respectively, until lawfully delivered to the board of canvassers of said county of Marion, and to the clerk of said county, and that to effect the object of said conspiracy the said Samuel E. Perkins unlawfully advised, persuaded, and procured the said Allen Hisey, inspector as aforesaid, unlawfully, and negligently to deliver to him, the said Samuel E. Perkins, the poll lists, tally papers, and certificates of the judges of election deposited with him, the said Allen Hisey, for return to the board of canvassers of said county, before the same had been returned to the said board of canvassers; and said Samuel E. Perkins and Simeon Coy unlawfully persuaded, advised, and procured the said Stephen Mattler unlawfully and negligently to deliver, and he, the said Stephen Mattler, consented to and did then and there unlawfully and negligently deliver to said Perkins and Coy the poll lists, tally papers, and certificate of the board of judges of election deposited with him, the said Stephen Mattler, for return to the board of canvassers of said county, before the same had been returned to and canvassed by said board of canvassers; and the said John E. Sullivan and George W. Budd unlawfully received and took from Lorenz Schmidt the poll list, tally paper and certificate of the board of judges of election deposited with said Lorenz Schmidt as aforesaid for return to the board of canvassers aforesaid; and the said John H. Councilman, negligently and in disregard of his duty, parted with and surrendered to a person or persons, to the grand jurors unknown, the poll list, tally paper and certificate of the judges of election deposited with him, the said John H. Councilman, for return to the board of canvassers; and said Simeon Coy unlawfully received, procured and took from Andrew Oehler, inspector as aforesaid, the poll list, tally paper and certificate of the judges of election deposited with him, the said Andrew Oehler, as aforesaid, to be returned to the board of canvassers of said county; and the said defendants, Simeon Coy, Henry Spaan, John E. Sullivan, and others of the defendants, to the grand jurors unknown, advised, persuaded and procured the said Joel H. Baker unlawfully and negligently to surrender and deliver to some person

or persons, to the grand jurors unknown, the poll list, tally paper and certificate of the judges of·election deposited with him for return to the said board of canvassers; and said defendants, Simeon Coy, Henry Spaan, John E. Sullivan, and other defendants, to the grand jurors unknown, advised, procured and persuaded said John Edwards, inspector as aforesaid, to unlawfully and negligently deliver and to surrender to some person or persons, to the grand jurors as aforesaid unknown, the poll list, tally paper and certificate of the judges of election·deposited with him, the said John Edwards, as aforesaid to be returned to the said board of canvassers; and said Simeon Coy, John H. Councilman, Henry Spaan, Charles N. Metcalf, John E. Sullivan, Albert T. Beck, George W. Budd, Stephen Mattler, William F. A. Bernhamer and John L. Reardon procured the election of said William A. Bernhamer as chairman óf the board of canvassers of said election in and for said county of Marion, in said State and district, and said William F. A. Bernhamer, as such chairman, refused to accept the poll list, tally paper and certificate of the judges of election deposited with said John H. Councilman as inspector as aforesaid, when first presented by said John H. Councilman to said board of canvassers and until the said tally paper and certificate of the judges of election had been unlawfully altered and forged; and further to effect the object of said conspiracy, said Simeon Coy sent one William H. Eden to said Joseph Becker, inspector as aforesaid, and to other inspectors, to the grand jurors unknown, with direction, instruction and request to said Joseph Becker and other inspectors, respectively, not.forthwith to return and deliver the returns of said election contained in sealed bags to the clerk of the Circuit Court of the county of Marion aforesaid, but to unlawfully bring the same to him, the said Simeon Coy; the said Simeon Coy, Samuel E. Perkins, Henry Spaan, Charles N. Metcalf, John E. Sullivan, George W.·Budd, Albert T. Beck, John L. Reardon and said persons to the grand jurors unknown, to whom said tally papers, poll lists and certificates of judges of election were so unlawfully surrendered and delivered by said John H. Councilman,·John Edwards, Allen

Hisey, Lorenz Schmidt, Andrew Oehler, Stephen Mattler, Joseph Becker and Joel H. Baker, respectively, as aforesaid, not being then and there officers of said election, and not being then and there persons authorized by law to have the possession and custody of said poll lists, tally papers and certificates of the judges of election aforesaid, contrary to the form of the statutes of the United States in such case made and provided, and against the peace and dignity of the United States of America.

"EMORY B. SELLERS,

"*Attorney for the U. S. for the District of Indiana.*"

The essence of this indictment is, that whereas by the law of the State of Indiana it was the duty of these inspectors to take the certified lists of the voters, with the returns of the judges, and safely keep them until they delivered them to the county clerk or to the board of canvassers who were to examine and count the votes of all the precincts in the county, they were persuaded by the defendants, who influenced them in various ways, to deliver up the certificates, poll lists, and tally papers to other persons who had no authority to take charge of them, and who thus had an opportunity of opening, examining, and falsifying those documents. It is the omission of this duty, which was imposed upon these inspectors by the law of Indiana, of safely keeping these papers confided to their care, that constitutes the foundation of this proceeding.

The provisions of the statutes of Indiana upon this subject may be found in the following sections of the Revised Statutes of that State:

"SEC. 4712. CERTIFICATE OF JUDGES. 34. When the votes shall be counted, the board of judges shall make out a certificate, under their hands, stating the number of votes each person has received, and designating the office; which number shall be written in words; and such certificate, together with one of the lists of voters and one of the tally papers, shall be deposited with the inspector, or with one of the judges selected by the board of judges."

"SEC. 4715. BOARD OF CANVASSERS. 37. The inspectors

of each township or precinct, or the judges of election to whom the certificates, poll books, and tally papers shall have been delivered, as provided for in this act, shall constitute a board of canvassers, who shall canvass and estimate the certificates, poll lists, and tally papers returned by each member of said board; for which purpose they shall assemble at the court-house on the Thursday next succeeding such election, between the hours of ten A.M. and six o'clock P.M."

The acts of Congress which are supposed to make the conduct of persons interfering with these election returns a criminal offence are to be found in the following sections of the Revised Statutes of the United States:

"SEC. 5440. If two or more persons conspire either to commit any offence against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to imprisonment not more than two years." [1]

"SEC. 5511. If, at any election for Representative or Delegate in Congress, any person knowingly personates and votes, or attempts to vote, in the name of any other person, whether living or dead, or fictitious; or votes more than once at the same election for any candidate for the same office; or votes at a place where he may not be lawfully entitled to vote; or votes without having a lawful right to vote; or does any unlawful act to secure an opportunity to vote for himself, or any other person; or by force, threat, intimidation, bribery, reward, or offer thereof, unlawfully prevents any qualified voter of

---

[1] By the act of May 17, 1879, 21 Stat. 4, c. 8, this section of the Revised Statutes was amended so as to read as follows:

" If two or more persons conspire either to commit any offence against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

any State, or of any Territory, from freely exercising the right of suffrage, or by any such means induces any voter to refuse to exercise such right, or compels or induces by any such means any officer of an election in any such State or Territory to receive a vote from a person not legally qualified or entitled to vote; or interferes in any manner with any officer of such election in the discharge of his duties; or by any such means or other unlawful means, induces any officer of an election or officer whose duty it is to ascertain, announce or declare the result of any such election, or give or make any certificate, document or evidence in relation thereto, to violate or refuse to comply with his duty or any law regulating the same; or knowingly receives the vote of any person not entitled to vote, or refuses to receive the vote of any person entitled to vote, or aids, counsels, procures or advises any such voter, person or officer to do any act hereby made a crime, or omit to do any duty the omission of which is hereby made a crime, or attempt to do so, he shall be punished by a fine of not more than five hundred dollars, or by imprisonment not more than three years, or by both, and shall pay the costs of the prosecution."

The charge in the indictment, which is supposed to be justified by this section, is that the defendants conspired to interfere with the officers of the election in the discharge of their duties; that they did by unlawful means induce them to violate and refuse to comply with their duty in regard to the custody and safekeeping of the election returns, and that they persuaded and induced these officers, or attempted so to do, to omit their duty in regard thereto.

Section 5512, although mainly relating to the registration of voters, makes it an offence for any "officer or other person who has any duty to perform in relation to such registration or election, in ascertaining, announcing or declaring the result thereof, or in giving or making any certificate, document or evidence in relation thereto," who "knowingly neglects or refuses to perform any duty required by law, or violates any duty imposed by law, or does any act unauthorized by law relating to or affecting such registration or election or the

result thereof, or any certificate, document or evidence in re-lation thereto, or if any person aids, counsels, procures, or advises any such voter, person or officer to do any act hereby made a crime, or to omit any act the omission of which is hereby made a crime, every such person shall be punishable as prescribed in the preceding section."

Section 5515 makes it an offence for any officer of an elec-tion, at which any Representative or Delegate in Congress is voted for, "who withholds, conceals or destroys any certificate of record so required by law respecting the election of any such Representative or Delegate; or who neglects or refuses to make and return such certificate as required by law; or who aids, counsels, procures, or advises any voter, person, or officer to do any act by this or any of the preceding sections made a crime, or to omit to do any duty the omission of which is by this or any of such sections made a crime, or attempts to do so."

These statutes of the United States, first prescribing a pun-ishment for a conspiracy to commit an offence against its laws, supplemented or preceded by federal laws made for the secu-rity and protection of the elections held for Representatives and Delegates to Congress, confer authority to punish a con-spiracy to prevent or interfere with that security, by proceed-ings in the federal courts. The difficulty and delicacy of the position arises from the circumstance that Congress, instead of passing laws for the election of such members and delegates from the States and Territories under the supervision of its own officers and at times when no other elections are held, has remitted to the States the duty of providing for such elections. It follows that in all cases where a member of Congress is elected from a State, that he is voted for at an election held under the laws of the State, which provide for holding other elections at the same time and place, under the direction of the same officers, at which ballots are cast for a great number of state and local officers. The same judges, inspectors, and clerks preside and conduct the election for all these different offices. The votes for members of Congress are generally put into the same box with those cast for the various state and

municipal officers. They are generally printed upon ballots, composed of one piece of paper, containing a long list of names, including those of the candidate for Representative in Congress, state, county and municipal officers.

While the Federal Government has not thought it advisable to provide for separate elections for Congressmen, nor to interfere with the general laws for the conduct of those elections passed by the States, it has enacted the sections above referred to, and among others those for the punishment of persons who violate the election laws at an election where votes are cast for a member of Congress. In doing this they have adopted the laws of the State, and they have provided that persons who violate them at such an election, that is, where a member is voted for, shall be punished by the provisions of the statutes of the United States and by proceedings in the federal courts.

This anomalous condition makes the question of the applicability of the laws of Congress on this subject to offences under the state statutes for the regulation of the casting, returning, and counting of votes somewhat complex; but the power, under the Constitution of the United States, of Congress to make such provisions as are necessary to secure the fair and honest conduct of an election at which a member of Congress is elected, as well as the preservation, proper return, and counting of the votes cast thereat, and, in fact, whatever is necessary to an honest and fair certification of such election, cannot be questioned. The right of Congress to do this, by adopting the statutes of the States, and enforcing them by its own sanctions, is conceded by counsel to be established. In regard to this they say in their brief:

"It is, perhaps, since the decision in *Ex parte Clarke*, 100 U. S. 399, past debate that Congress has the power under the Constitution to adopt the laws of the several States, respecting the mode of electing members of Congress, and, as resulting from that power, the right to prescribe punishment for infractions of the laws so adopted. This court has held more than once that Congress has exercised this power, and has adopted these laws, and, with them, the officers created under them.

making them for the purposes of the election of representatives in Congress its officers, and has added new sanctions to such laws, and subjected such officers to the penalties of these sanctions. All this is conceded."

The main objection to the indictment, however, which is urged with great earnestness by counsel for appellants, is, that it contains no averment that the intent and purpose of the defendants' conduct was to affect in any manner the election of a member of Congress, or to influence the returns relating to that office. The proposition is put in various forms, that since there were many state and local officers also voted for at the election in question and in those precincts, and as it is consistent with the indictment that the actions of the conspirators were directed only to the election of those persons, and not to that for the federal office of a congressional representative, the indictment is for that reason insufficient.

The charge is that the conspirators *unlawfully and feloniously* induced the election officers to omit to perform their duty in this respect, which is in general conceded to be expressive of an evil intent. But counsel demand something more than this general evil intent in tampering with the poll lists, tally papers and certificates, although it is not denied that the object of the parties accused, in inducing the election officers to violate their duty, proceeded from a criminal intent, or that it was done for the purpose of affecting the returns contained in the papers that were withheld, or exposing them to the danger of mutilation and alteration. It is said, however, that since the evil intent is not shown to have been specifically aimed at the returns of the vote for congressmen, the statutes of the United States can have no force so far as the infliction of any penalty is concerned; and it is asserted that Congress had no power to provide for any punishment where no intent affecting the congressional election is averred.

It would be a very singular principle to establish, that, where a man was charged with a homicide, caused by maliciously shooting into a crowd with the purpose of killing some person against whom he bore malice, but with no intent to injure or kill the individual who was actually struck by the shot, he

should be held excused because he did not intend to kill that particular person, and had no malice against him.

The analogy of this example to the present case is close. The persons accused did desire and intend to interfere with the election returns, and they did purpose to falsify those returns, as to some of the persons, at least, who were then voted for as candidates. It is argued on their behalf that because it is not averred in the indictment that they intended to falsify the election returns with regard to the congressional vote, or to affect those particular returns, it is to be held bad. It is also insisted that the felonious intent had relation to the action of inducing the officers to omit the duty of keeping carefully the poll books and tally sheets, and although the records of the votes for congressman might possibly also suffer along with a number of other persons who might be affected by that omission, yet because there was not in the minds of the conspirators the specific intent or design to influence the congressional election, they are not to be held liable under this statute.

The object to be attained by these acts of Congress is to guard against the danger, and the opportunity, of tampering with the election returns, as well as against direct and intentional frauds upon the vote for members of that body. The law is violated whenever the evidences concerning the votes cast for that purpose are exposed or subjected in the hands of improper persons or unauthorized individuals to the opportunity for their falsification, or to the danger of such changes or forgeries as may affect that election, whether they actually do so or not, and whether the purpose of the party guilty of thus wresting them from their proper custody and exposing them to such danger might accomplish this result.

There are many instances when an act may be criminal in its character without there being a criminal intent. Gross carelessness, by which a person may be injured or killed, while it may reduce the offence from murder to manslaughter, or modify the penalty, does not wholly relieve the person guilty of it from criminal responsibility. Governments, both national and state, and even municipal, make laws for protection against articles, such as powder or glycerine, from acci-

dents resulting from negligence, where no intention exists to cause an injury. If persons violate these laws they become liable to the penalty prescribed, because the necessity for strict care and caution in regard to such dangerous substances requires that carelessness in regard thereto, from which damage might result, should be punished, notwithstanding there may be an absence of any criminal or felonious intent.

The case before us is eminently one of this character. Crimes against the ballot have become so numerous and so serious that the attention of all legislative bodies has been turned with anxious solicitude to the means of preventing them, and to the object of securing purity in elections and accuracy in the returns by which their result is ascertained. The acts of Congress and of the State of Indiana now under consideration are of this class. The manifest purpose of both systems of legislation is to remove the ballot-box as well as the certificates of the votes cast from all possible opportunity of falsification, forgery, or destruction; and to say that the mere careless omission, or the want of an intention on the part of persons who are alleged to have acted feloniously in the violation of those laws, excuses them because they did not intend to violate their provisions as to all the persons voted for at such an election, although they might have intended to affect the result as regards some of them, is manifestly contrary to common sense and is not supported by any sound authority. It may be added that the language of the act of Congress in describing these offences, clearly does not require, in regard to some of these acts of omission and failure to perform the duties imposed upon election officers, that there should be alleged or proved an intention to give an opportunity for improper tampering with the records of the votes cast.

It is also strenuously insisted by counsel for the appellants in their argument that no offence under the act of Congress is recited in the indictment. We have already stated, however, what the indictment charges, and given extracts from those acts and the statutes of Indiana on that subject. While we do not think it necessary to elaborate the argument, which has been fully considered in the court below, and in several opin-

ions on writs of error and applications for *habeas corpus* in various inferior tribunals, we do not doubt that the indictment sets forth a conspiracy by the parties to this appeal to induce the inspectors of election in Indianapolis to omit the discharge of their duty and to fail to safely keep and guard the poll lists, tally papers and certificates committed to their care for the precincts at which they each presided. Nor do we doubt that the statute of Indiana imposed such a duty upon those inspectors, which they were induced to violate by the persuasion and influence of the parties to this conspiracy.

We are the less inclined to enter into these controversies, as to a narrow construction of the statutes of Indiana and the acts of Congress, because we think they were questions properly before the District Court on the trial of the prisoners. They were questions of which that court had jurisdiction and which it was its duty to decide. When decided by that court they were not subject to review here by a writ of error, nor were they in a proper or just sense questions affecting its jurisdiction. It would be as well to say that every question concerning the sufficiency and validity of an indictment and the evidence necessary to support it, was a matter of jurisdiction, and authorized an interference, if error took place, by a writ of *habeas corpus* for its correction. That this cannot be done has been repeatedly held in this court.

The leading case on the subject is that of *Ex parte Tobias Watkins*, 3 Pet. 193, in which the opinion was delivered by Chief Justice Marshall. Watkins was committed to jail in the District of Columbia by virtue of a judgment of the Circuit Court of the United States for that District. An application for a writ of *habeas corpus* was made on his behalf upon the ground that the indictment on which he was convicted did not show any jurisdiction in that court, and that it charged no offence for which he could be punished therein. The eminent Chief Justice, after remarking upon the general proposition that a commitment by the judgment of a court of competent jurisdiction is a sufficient answer to a writ of *habeas corpus* intended to effect his discharge, said: "The judgment of a court of record whose jurisdiction is final is as conclusive

on all the world as the judgment of this court would be. It is as conclusive on this court as it is on other courts. It puts an end to inquiry concerning the fact, by deciding it. The counsel for the prisoner admit the application of these principles to a case in which the indictment alleges a crime cognizable in the court by which the judgment was pronounced, but they deny their application to a case in which the indictment charges an offence not punishable criminally according to the law of the land. But with what propriety can this court look into the indictment? We have no power to examine the proceedings on a writ of error, and it would be strange if, under color of a writ to liberate an individual from unlawful imprisonment, we could substantially reverse a judgment which the law has placed beyond our control. An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous. The Circuit Court for the District of Columbia is a court of record, having general jurisdiction over criminal cases. An offence cognizable in any court is cognizable in that court. If the offence be punishable by law, that court is competent to inflict the punishment. The judgment of such a tribunal has all the obligation which the judgment of any tribunal can have. To determine whether the offence charged in the indictment be legally punishable or not, is among the most unquestionable of its powers and duties. The decision of this question is the exercise of jurisdiction, whether the judgment be for or against the prisoner. The judgment is equally binding in the one case and in the other, and must remain in full force unless reversed regularly by a superior court capable of reversing it." pp. 202, 203.

It may be said that this language is too broad in asserting that, because every court must pass upon its own jurisdiction, such decision is itself the exercise of a jurisdiction which belongs to it, and cannot, therefore, be questioned in any other court. But we do not so understand the meaning of the court. It certainly was not intended to say that because a federal court tries a prisoner for an ordinary common law

offence, as burglary, assault and battery, or larceny, with no averment or proof of any offence against the United States, or any connection with a statute of the United States, and punishes him by imprisonment, he cannot be released by *habeas corpus* because the court which tried him had assumed jurisdiction.

In all such cases, when the question of jurisdiction is raised, the point to be decided is, whether the court has jurisdiction of that class of offences. If the statute has invested the court which tried the prisoner with jurisdiction to punish a well defined class of offences, as forgery of its bonds or perjury in its courts, its judgment as to what acts were necessary under these statutes to constitute the crime is not reviewable on a writ of *habeas corpus*.

And, as the laws of Congress are only valid when they are within the constitutional power of that body, the validity of the statute under which a prisoner is held in custody may be inquired into under a writ of *habeas corpus* as affecting the jurisdiction of the court which ordered his imprisonment. And if their want of power appears on the face of the record of his condemnation, whether in the indictment or elsewhere, the court which has authority to issue the writ is bound to release him. *Ex parte Siebold*, 100 U. S. 371.

So, while we have attempted to answer the main argument of prisoners' counsel, that Congress had no power to punish an act not specifically intended to affect the election of a member of Congress, though the act was done with a felonious intent, and that if it had such power it has not exercised it, we thought it not necessary, under the principle laid down in *Ex parte Watkins*, to inquire into the sufficiency of the allegation of the more minute details of the offence as charged in the indictment. We are not here to consider it as on a demurrer before trial; but, finding that the District Court had a general jurisdiction of this class of offences, we proceed no further in the inquiries on that subject.

In *Ex parte Parks*, 93. U. S. 18, 23, this question was very ably reviewed upon all the authorities. The case of Watkins was reaffirmed, and the general proposition announced that it

was apparent from a review of the cases that "where the prisoner is in execution upon a conviction the writ ought not to be issued, or, if issued, the prisoner should at once be remanded, if the court below had jurisdiction of the offence, and did no act beyond the powers conferred upon it. . . . The District Court had plenary jurisdiction, both of the person, the place, the cause, and everything about it. To review the decision of that court by means of a writ of *habeas corpus* would be to convert that writ into a mere writ of error, and to assume an appellate power which has never been conferred upon this court."

In *Ex parte Yarbrough*, 110 U. S. 651, the subject was again examined very fully. The court reiterated the doctrine that the writ of *habeas corpus* cannot be converted into a writ of error by which the judgment of the court passing the sentence can be reviewed. The court there said: "If that court had jurisdiction of the party and of the offence for which he was tried, and has not exceeded its powers in the sentence which it pronounced, this court can inquire no further. This principle disposes of the argument made before us on the insufficiency of the indictments under which the prisoners in this case were tried. Whether the indictment sets forth in comprehensive terms the offence which the statute describes and forbids, and for which it prescribes a punishment, is in every case a question of law, which must necessarily be decided by the court in which the case originates, and is therefore clearly within its jurisdiction. Its decision on the conformity of the indictment to the provisions of the statute may be erroneous, but if so it is an error of law made by a court acting within its jurisdiction, which could be corrected on a writ of error if such writ was allowed, but which cannot be looked into on a writ of *habeas corpus* limited to an inquiry into the existence of jurisdiction on the part of that court." pp. 653, 654. Citing *Ex parte Tobias Watkins* and *Ex parte Parks, supra*.

We cannot better close this opinion than by a further extract from that of the court in *Ex parte Yarbrough*, p. 666: "In a republican government, like ours, where political power

is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptations to control these elections by violence and by corruption is a constant source of danger. Such has been the history of all republics, and, though ours has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources."

*The judgment of the Circuit Court, denying the writ of habeas corpus, is affirmed.*

MR. JUSTICE FIELD dissenting.

The petitioners and appellants were indicted in the District Court of the United States for the District of Indiana for an alleged conspiracy to commit an offence against the United States, and were convicted and sentenced to pay a fine and be imprisoned. The fine of Bernhamer was one thousand dollars, and his imprisonment was for one year; the fine of Coy was one hundred dollars, and his imprisonment was for eighteen months. The offence charged was that the accused conspired with one Perkins to induce the inspectors of an election held in Indiana, in November, 1886, at which a Representative in Congress was voted for, to omit a duty imposed upon them by the laws of that State, to safely keep the poll lists of the voters, the tally papers, and the certificates of the judges of election, until they were delivered to the clerk of the county, or to its board of canvassers, by whom the votes were to be examined and counted; and, to effect the object of the conspiracy, persuaded the inspectors to deliver those papers to persons who had no authority to take charge of them.

On this appeal we can only inquire whether the Circuit Court erred in refusing to issue the writ; and I admit, in determining upon the propriety of issuing it, the sole question that court could consider was whether the District Court of Indiana, in which the appellants were indicted, tried, and convicted, had jurisdiction of the offence and of the parties accused, and to render the judgment pronounced. As was said in *Ex parte Siebold*, 100 U. S. 371, 375: "The only ground

on which this court, or any court, without some special statute authorizing it, will give release on *habeas corpus* to a prisoner under conviction and sentence of another court, is the want of jurisdiction in such court over the person or the cause, or some other matter rendering its proceedings void." But that this court and the Circuit Court can exercise jurisdiction by *habeas corpus*, in cases where it is alleged that by the action of an inferior tribunal a citizen of the United States has been unlawfully deprived of his personal liberty, is well established; and they can look into the record of the inferior court, under whose judgment the parties are restrained of their liberty, to ascertain whether it had jurisdiction to hold and try them, and render the judgment. If it appear upon such examination that the inferior court had jurisdiction, the further consideration of the case is ended. The writ of *habeas corpus* cannot be made to take the place of a writ of error, so as to authorize an examination into any alleged errors of the inferior court in reaching its conclusion. But if it had no jurisdiction over the parties or of the offence with which they are charged, or to render the judgment, the Circuit Court and this court can interfere and discharge them. The broad doctrine laid down in *Ex parte Watkins*, 3 Pet. 193, that where no revision by a higher court of the judgment of a court in a criminal case is authorized, another court will not inquire into its jurisdiction upon *habeas corpus*, has been modified by subsequent decisions.

As in the present case no objection was made before the Circuit Court, or is made here, to the jurisdiction of the District Court of Indiana over the persons of the accused, or to render the judgment pronounced, if the offence charged was one of which that court could take cognizance, the sole question before us is whether the indictment charges an offence thus cognizable.

In *Ex parte Siebold* and *Ex parte Clarke*, reported in 100 U. S. 371, 399, it was held that Congress had the power under the Constitution to adopt the laws of the States respecting the election of officers of the States, where at such election a member of Congress is to be voted for, and that it could impose a punishment for a violation of such laws. This was

held in the face of the objection that it was not competent for Congress to punish a state officer for the manner in which he discharged the duties imposed upon him by the laws of the State; nor to make the exercise of its punitive power depend upon the legislation of the States. But the court at the same time held that the adoption by Congress of the laws of the State only extended so far as the election concerned Representatives in Congress. Its language was: "If, for its own convenience, a State sees fit to elect state and county officers at the same time, and in conjunction with the election of representatives, Congress will not thereby be deprived of the right to make regulations in reference to the latter. We do not mean to say, however, that for any acts of officers of election, having exclusive reference to the election of state or county officers, they will be amenable to Federal jurisdiction; nor do we understand that the enactments of Congress now under consideration have any application to such acts." 100 U. S. 393.

It would seem, therefore, essential in an indictment presented in a United States court, for an offence cognizable by that court under these state laws, that it should aver that the violation of them was intended to affect the election of a member of Congress. How inspectors of election or other officers of a State may conduct the elections, so far as those elections relate to state officers, and what liability they may incur in such cases for the omission of duties imposed upon them by state laws, are matters entirely within the cognizance of the state tribunals. A violation of the state laws as to the election of persons to fill state offices cannot be made the subject of punishment by a federal court, nor, of course, a conspiracy to induce state officers to violate those laws. The judicial power of the United States does not extend to a case of that kind. The Constitution defines and limits that power. It declares that the power shall extend to cases in law and equity arising under the Constitution, the laws of the United States, and treaties made under their authority; to cases affecting ambassadors, other public ministers, and consuls; to cases of admiralty and maritime jurisdiction, and to various contro-

versies to which the United States or a State may be a party, or between citizens of different States, or citizens of the same State claiming lands under grants of different States, or between citizens of a State and any foreign State, citizens or subjects. Whilst the judicial power thus defined and limited may be applied to new cases as they arise under the Constitution and laws of the United States, it cannot be extended by Congress so as to include cases not enumerated in that instrument, as has been often held by this court.

The indictment in this case charges a conspiracy to induce certain election officers appointed under the laws of Indiana to commit a crime against the United States, the crime being the alleged omission by them to perform certain duties imposed by the laws of that State respecting elections. But it contains no allegation that the alleged conspiracy was to affect the election of a member of Congress; which, as said above, appears to me to be essential to bring the offence within the jurisdiction of the court. If the conspiracy was to affect the election of a state officer, no offence was committed cognizable in the District Court of the United States. If it had any other object than to affect the election of a member of Congress, it was a matter exclusively for the cognizance of the state courts.

In several States, and probably in a majority of them, numerous officers, state, county, city, and village, are elected at the same time with representatives in Congress; and according to the present decision a conspiracy to persuade the officers of election to omit any duty imposed upon them under the laws of the State, though designed merely to affect the election of an inferior magistrate of a village, is an offence against the United States, punishable in the Federal courts. Thus, obedience to the laws of the State in matters of even local offices, if a member of Congress is voted for at the same election, may be enforced by the courts of the United States, instead of by the proper tribunals of the State whose laws have been violated. I am not able to assent to a doctrine which leads to this result, and gives the Federal courts power to intermeddle with the action of state officials in an election

for local offices whenever a member of Congress may have been voted for at the same time. I agree to what is said by the court as to the temptations existing in a republican government, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, to control those elections by violence and corruption. But I do not perceive in that fact any reason why the punishment of fraud committed or designed at state elections for state officers should be transferred to the Federal courts. The States are as much interested in guarding against frauds at such elections, and in maintaining their purity, as it is possible for the general government to be. They do not require for their protection in such matters the aid of the general government, any more than in other domestic affairs. As observed on a former occasion, "they are invested with the sole power to regulate domestic affairs of the highest moment to the prosperity and happiness of their people, affecting the acquisition, enjoyment, transfer, and descent of property; the marriage relation and the education of children; and if such momentous and vital concerns may be wisely and safely intrusted to them, I do not think that any apprehension need be felt if the supervision of elections in their respective States should also be left to them," where, I may add, it properly belongs.

I am of opinion that the writ of *habeas corpus* should have been issued in this case by the Circuit Court, and that its order denying the petition of the appellants should, therefore, be reversed.